UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

Wayne Catalano, Karen Radford, Christy Deringer, Tomoko Nakanishi, Veronica Pereyra, Roberta Sinico, Barbara Speaks, and Edmond Dixon, individually on behalf of themselves and all others similarly situated,

          Plaintiffs,

v.

Lyons Magnus, LLC and TRU Aseptics, LLC,

          Defendants.

Case No. 7:22-cv-06867-KMK

Hon. Kenneth M. Karas

### DECLARATION OF JASON SULTZER IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

**I.   INTRODUCTION**

I, Jason P. Sultzer, submit this Declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, and affirm that the following is truthful and accurate:

1. I am one of the attorneys principally responsible for the handling of this case. I am personally familiar with the facts set forth in this declaration. If called as a witness, I could and would competently testify to the matters stated herein.

2. Attached as **Exhibit 1** is the Settlement Agreement with exhibits in this action.

3. On October 27, 2023, the Court granted Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement in this action and granted related relief. ECF No. 34 (Preliminary Approval Order). In that Order, the Court conditionally designated me and four other lawyers as Class Counsel for the Settlement Class. ECF No. 35 at 4. Those lawyers are: Charles E. Schaffer of Levin Sedran & Berman, Paul J. Doolittle of Poulin, Willey, Anastopoulo, LLC, Kiley Grombacher

of Bradley Grombacher, LLP, and Bryan Aylstock of Aylstock, Witkin, Kreis & Overholtz, PLLC (collectively, "Class Counsel"). *Id.*

4. Per the terms of the Settlement Agreement, the Settlement Fund means a total payment by Defendants in the amount of $3,500,000. *See* Ex. 1. Assuming the Court grants the Attorneys' Fees and Costs in the amount of $1,210,411.13, the Incentive Awards to the Class Representatives in the total amount of $4,000.00, and the costs of the notice and administrative costs in the amount of $600,281.95, the estimated Available Settlement Funds amount to $1,685,306.92.

5. The reaction to the Settlement has been overwhelmingly favorable.

6. No objections have been filed to the Settlement or attorneys' fees request and only twelve requests for exclusion has been received by the Claim Administrator.

7. As a result of the robust Notice Program, the Claim Administrator has received 180,701 Valid Claim forms.

8. As a result of this settlement, consumers have the opportunity to receive cash payments and on average claimants who submitted proof of purchase will receive an average of $25.19, while claimants who submitted Valid Claims without proof of purchase will receive an average of $9.31. This recovery is more than the 30% of the best-case price premium Plaintiffs could have recovered at trial.

9. This proposed class action settlement would resolve the claims of purchasers of Defendants Lyons Magnus, LLC ("Lyons Magnus") and TRU Aseptics, LLC ("TRU") (collectively "Defendants") nutritional and beverage ("Covered Products").

## II.    BACKGROUND, PROCEDURAL HISTORY, AND SETTLEMENT

10. Before commencing the Litigation, Class Counsel extensively investigated and analyzed, among other things, Defendants' marketing campaign, the relevant FDA guidelines concerning labeling and advertising disclosure requirements, FDA guidelines regarding the

2

presence of *Cronobacter sakazakii* and/or *Clostridium botulinum* in consumer products, the scientific research concerning the dangers of *Cronobacter sakazakii* and/or *Clostridium botulinum*, and research regarding how Defendants should have known the Products contained *Cronobacter sakazakii* and/or *Clostridium botulinum*.

11.     On August 11, 2022, Plaintiff Wayne Catalano filed a class action complaint on behalf of "all consumers who purchased the Products anywhere in the United States during the Class Period," in this Court against Lyons Magnus alleging that Lyons Magnus products sold in the United States were contaminated with the bacteria *Cronobacter sakazakii* and seeking compensation for alleged economic losses sustained by U.S. consumer purchasers of the Covered Products. *See Catalano v. Lyons Magnus, LLC et al.*, Case No. 7:22-cv-06867-KMK (S.D.N.Y.) (the "Catalano Action").

12.     Similar class action lawsuits arising from the same recall were filed in California, Illinois, Florida, North Carolina, and South Carolina (collectively with the Catalano action, the "Actions" or the "Litigation") alleging violations of state consumer protection laws, breach of express and implied warranty, unjust enrichment, and negligent and/or fraudulent misrepresentation and omission claims.[1]

13.     On March 16, 2023, Counsel for the Catalano Action filed a letter with the court requesting leave to notice settlement and file a consolidated complaint. (Dkt. 21). On April 14, 2023, with the Court's permission, Plaintiffs filed a consolidated class action complaint ("CCAC") in the Catalano action adding Plaintiffs Barbara Speaks, Karen Radford, Tomoko Nakanishi, Roberta

---

[1] The related matters include: *Karen Radford, et al v. Lyons Magnus, LLC and TRU Aseptics, LLC*, 1:23-cv-00088 (E. D. Ca.); *Christy Deringer, et al v. Lyons Magnus, LLC and TRU Aseptics, LLC*, 1:22-cv-00968 (E.D. Ca.); *Tomoko Nakanishi, et al v. Lyons Magnus, LLC and TRU Aseptics, LLC*, 1: 22-cv-06899 (N. D. Ill.); *Veronica Pereya, et al v. Lyons Magnus, LLC and TRU Aseptics, LLC*, 1:22-cv-06622 (N. D. Ill.); *Roberta Sinco, et al v. Lyons Magnus, LLC and TRU Aseptics, LLC*, 1:22-cv-01479 (E. D. Ca.); *Barbara Speaks, et al v. Lyons Magnus, LLC and TRU Aseptics, LLC*, 1:22-cv-01043 (M.D. N.C.); and *Edmond Dixon, et al v. Lyons Magnus, LLC and TRU Aseptics, LLC*, 2:22-cv-04039 (D. S.C.)

Sinico, and Edmond Dixon. (Dkt. 23). Plaintiffs alleged that independent testing confirmed the presence of *Cronobacter sakazakii* and/or *Clostridium botulinum* in the Products and that Defendants improperly marketed and sold several nutritional and beverage products that contained *Cronobacter sakazakii* and/or *Clostridium botulinum* in violation of state law and sought compensation for alleged economic losses sustained by U.S. consumer purchasers of the products. *Id*. The CCAC alleged violations of New York, North Carolina, Illinois, and Florida consumer protection laws and claims for breach of express and implied warranties, fraud, and negligent misrepresentation and unjust enrichment. (the "Litigation") *Id.*

14. Plaintiffs seek to represent a nationwide class of consumers who purchased the Covered Products. Plaintiffs' Counsel has substantial experience in prosecuting class actions and in particular actions that involve contamination of consumer products. *See Susan Swetz, et al. v. GSK Consumer Health, Inc.*, Case No. 7:20-cv-04731 (S.D.N.Y); *Delcid et al. v. TCP Hot Acquisition LLC et al.*, 1:21-cv-09569-DLC (S.D.N.Y); *Schmitt, et al. v. Younique, LLC*, No. 8:17-cv-01397-JVS-JDE (C.D. Cal.); *Bangoura v. Beiersdorf, Inc.*, Case No. 1:22-cv-00291-BMC (E.D.N.Y); *Goldstein v. Henkel Corporation et al.*, Case No. 3:22-cv-00164-AWT (D. Conn.).

15. Prior to the filing of the actions, and throughout the litigation, Plaintiffs' Counsel undertook an extensive investigation into the bacterial contamination or risk of contamination with bacteria in the Covered Products, issues relating to how the Covered Products were not adequately tested and screened for *Cronobacter sakazakii* and/or *Clostridium botulinum* and prepared for protracted litigation.

16. Among other things, Plaintiffs' Counsel's investigation and due diligence included, inter alia, reviewing publicly available documents, conducting research on claims and federal regulations governing antiperspirant products including limits for contaminants like *Cronobacter sakazakii* and/or *Clostridium botulinum*, interviewing and conferring with experts pertaining to

4

sourcing of ingredients, testing/screening for *Cronobacter sakazakii* and/or *Clostridium botulinum* and considering viable economic damages models.

17.     On March 10, 2023, Defendants pre-motion letter indicating their intent to file a motion to dismiss the Amended Complaint, inter *alia*, on the grounds that: (a) Plaintiff lacked Article III standing; (b) Plaintiff failed to allege a misstatement, omission, or injury; (c) Plaintiff failed to allege the existence or an express warranty, that the Products were defective, or that Defendants had notice of any alleged defect; (4) Plaintiff failed to allege a deprivation of the benefit of the bargain or a substantive relationship between the parties to sustain the unjust enrichment claim; (5) the negligent misrepresentation claim failed because it was not alleged with particularity, did not allege privity with the Defendants, and was barred by the economic-loss doctrine. (Dkt. 20).

18.     Following the filing of Defendants' pre-motion letter, parties commenced settlement negotiations, considering the cases' strengths and weakness. To assist with these settlement negotiations, the Parties agreed to proceed to private mediation with the Honorable Steven Gold (Ret.). In advance of the mediation, the Parties exchanged discovery relevant to their claims and defenses. This included discovery related to Plaintiffs' claims, including extensive sales, distribution and marketing information regarding the Covered Products, and the technical scientific information pertaining to the manufacturing process and suppliers regarding the sources and reasons for the *Cronobacter sakazakii* and/or *Clostridium botulinum* contamination, as well as the protocols put in place by Defendant to ensure that such a contamination does not reoccur. This is largely the same information that would have been produced had the case proceeded to formal discovery. Accordingly, the Parties were sufficiently informed at the time of the mediation of the strengths and weaknesses of their respective positions, the size of the putative class, and the damages at issue to negotiate a reasonable settlement.

19. In connection with the mediation, Class Counsel requested, and Defendants produced, critical discovery to enable Plaintiffs to evaluate their claims and position themselves to negotiate a settlement that would be fair and reasonable on behalf of the Settlement Class. This information included information concerning the sales data of Covered Products throughout the Class Period as well as Defendants' quality control and testing procedures regarding contaminants including *Cronobacter sakazakii* and/or *Clostridium botulinum*

20. In addition, Class Counsel conducted significant legal research and an investigation into industry reports, scientific literature, and the Covered Products' market segment as follows:

   a. Class Counsel thoroughly analyzed the legal landscape and evaluated the risks and benefits of prosecuting the Litigation and an early resolution, including research into the various state consumer protection laws and available remedies, and evaluating class certification issues.

   b. Class Counsel extensively analyzed the claims alleged in the complaints, Defendants' advertising campaigns, the relevant regulations and guidelines concerning labeling and advertising disclosure requirements for consumer products, such as the contaminated Lyons Magnus products, regulations and guidelines regarding the presence of hazardous and dangerous substances such as bacteria in consumer products, the scientific research and literature concerning the dangers of bacteria (including *Cronobacter sakazakii* and/or *Clostridium botulinum*), and research regarding how Defendants should have known the Products contained bacteria.

   c. Class Counsel investigated and consulted with industry experts regarding inter alia the presence of bacteria in beverage and nutrition products, regulations governing bacteria in consumer products, potential sources and elimination of that source of bacteria in consumer products, and testing and screening for bacteria in consumer products.

   d. Class Counsel analyzed the chain of distribution of the Covered Products and pricing per unit to help support and determine Plaintiffs' damages model.

   e. Class Counsel investigated and consulted with experts regarding damages models for consumers purchasing an adulterated and or misbranded product contaminated with bacteria.

   f. Class Counsel conducted research into the market segment related to the Covered Products to understand the potential scope of this matter, economic losses to Class Members, and marketing and sales trends, practices, and patterns.

21. Class Counsel also conducted testing of the products to determine the scope of

potential contamination

22. On March 14, 2023, the Parties attended a full-day mediation with Judge Gold. With Judge Gold's assistance, the Parties reached a non-reversionary common fund settlement. Before and during these settlement discussions and mediation, the Parties had arm's-length exchange of sufficient information to permit Plaintiffs and their counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

23. The Parties did not discuss Attorneys' Fees and Costs or any potential Incentive Award until they first agreed on the substantive terms of this settlement.

24. Class Counsel worked together to thoroughly analyze the legal landscape, including conducting research into the various state consumer protection laws and available remedies, Article III standing, preemption and evaluating matters relating to class certification, in order to fully evaluate the risks and benefits to a potential early resolution.

25. Indeed, Class Counsel worked cooperatively to coordinate the Litigation and to save judicial time and resources to consolidate the multiple similar litigations without a protracted battle for lead counsel and to lead the case to mediation and an early resolution.

26. Class Counsel conducted a detailed and extensive analysis of the claims, including labeling claims for the Covered Products, the relevant FDA regulations concerning labeling and advertising disclosure requirements for beverage and nutritional products FDA guidelines regarding the presence of *Cronobacter sakazakii* and/or *Clostridium botulinum* in consumer products, and the scientific research concerning the dangers of *Cronobacter sakazakii* and/or *Clostridium botulinum*.

27. Moreover, Class Counsel analyzed the chain of distribution of the Covered Products and pricing per unit to help support and determine Plaintiffs' damages model.

28. In addition, Class Counsel conducted research into the market segment related to the Covered Products to understand the potential scope of this matter and marketing and sales trends,

practices, and patterns for the relevant industry.

29. Class Counsel also analyzed in conjunction with economic expert(s) damage models including full refund under a disgorgement model and/or a price premium model utilizing conjoint analysis to determine consumers likely and best recovery at trial.

30. In connection with the mediation, Class Counsel requested mediation discovery in order to evaluate the claims and position themselves to negotiate a settlement that would be fair and reasonable on behalf of the Settlement Class.

31. Specifically, Class Counsel requested, and Defendants produced, documents and information regarding the sales data of Covered Products throughout the Class Period as well as Defendants' quality control and testing procedures regarding contaminants including *Cronobacter sakazakii* and/or *Clostridium botulinum*.

32. The settlement negotiations were conducted at arm's-length over a period of several months between counsel very experienced in class actions.

33. On March 14, 2023, the Parties participated in an all-day mediation. With the assistance of Judge Gold, the Parties reached an agreement in principle at the mediation session. However, the Parties continued to pursue settlement discussions for several months, working out the details of the settlement.

34. On March 16, 2023, the Parties informed the Court that they had reached an agreement to resolve the matter (ECF No. 21).

35. On June 2, 2023, the Parties executed the Settlement Agreement, and Plaintiffs moved for preliminary approval of the class action settlement on June 12, 2023. (ECF No. 30).

36. With respect to selecting a settlement administrator, before selecting Angeion, Plaintiffs sought multiple bids from claims administrators and interviewed and vetted Angeion and its proposed notice plan for this settlement.

37. The parties selected Angeion based on its reputation for excellent work and breadth of experience administering other similar consumer class actions. For example, Angeion has administered very similar settlements regarding contamination of consumer products. See *Delcid et al. v. TCP Hot Acquisition LLC et al.*, 1:21-cv-09569-DLC (S.D.N.Y); *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.).

38. On October 27, 2023, the Court granted Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement, Preliminary Certification of Settlement Class and Approval of Notice Plan and scheduled a Final Approval hearing for April 9, 2023 (ECF No. 34).

### III. SUMMARY OF SETTLEMENT BENEFITS AND RISKS OF CONTINUED LITIGATION

39. As stated above, Class Counsel has substantial experience in prosecuting class actions of a similar size, scope, and complexity; and in particular actions that involve contamination of consumer products. *See Clinger v. Edgewell Personal Care Brands, LLC*, 3:21-cv-01040-JAM (D. Conn); *Delcid et al. v. TCP Hot Acquisition LLC et al.*, 1:21-cv-09569-DLC (S.D.N.Y); *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.); *Goldstein v. Henkel Corporation et al.*, Case No. 3:22-cv-00164-AWT (D. Conn.).

40. Class Counsel has made $3.5 million in valuable benefits available to Class Members. § 3.1. which will be exhausted to pay all Approved Claims, as well as any attorneys' Fee Award, Service Awards, and Notice and Other Administrative Costs that the Court approves. §3.1. In addition, Plaintiffs were able to negotiate and secure an additional $75,000 from Defendants towards the cost of the notice, which will help preserve funds available from the Common Fund to the Class. *Id*. Settlement Class Members who submit a Valid Claim Form with Proof of Purchase shall receive the full purchase price for each Covered Product listed on the Proof of Purchase, inclusive of all taxes. § 3.4(a). Settlement Class Members who submit a Valid Claim Form without Proof of Purchase shall receive the average retail price for up to two (2) Covered Products claimed

9

per household plus a 10% allowance for sales tax, as such price is determined in good faith by the Defendants and provided to the Claim Administrator. § 3.4(b). Settlement Class Members who obtained a refund from the Recall may be able to receive further relief from the settlement. If a Settlement Class Member submitted a claim in the Recall, the amount of that Settlement Class Member's payment shall be reduced by the amount each Settlement Class Member has received or shall receive from the Recall (provided that the payment shall not be reduced below $0.00). § 3.4(c).

41. The Settlement achieved by Class Counsel benefits individual Class Members who submitted claims in a number of ways. First, besides putting money directly in their pockets, it has significantly expanded the scope of Defendants recall/refund program. Under the terms of the settlement, individual class members receive either the full purchase price of the Products they bought, or the average price of the Products for up to two products, if they do not have proof of purchase. This is compensation that was not available through Defendants' recall of the Products at issue in the litigation. Specifically, the recall required proof of purchase for a refund. Under the Settlement Agreement, however, Settlement Class Members who submit an Approved Claim Form without Proof of Purchase shall receive the average purchase price for up to two Covered Products. § 3.4(b). On average, claimants who did not have proof of purchase will receive $9.3.

42. Second, the settlement benefits the entire Class as a whole, whether class members submitted a claim or not, by providing a high percentage of the total possible recovery in this litigation in the event the case was successfully tried to conclusion. The total sales of the Products that are the subject of the litigation and which are believed to be contaminated are approximately $11.3 million during the relevant time period. The $3.5 million recovery for the Class under the settlement represents approximately 31% of Defendants' potential liability under a total disgorgement theory. This alone is a very significant outcome in cases like these, especially considering the risks of losing before or at trial, and how efficiently it was done. However, the

full disgorgement theory would have been challenged by Defendants at trial and may not have succeeded because Defendants would argue that even contaminated products are not completely worthless.

43. As a result, Plaintiffs' damage theory likely to succeed here would have been based on the premium class members paid over what they would have paid had they known about the contamination or risk of contamination. Based on Class Counsels' experience in these kinds of consumer product contamination cases, as well as discussions with an economic expert who frequently uses conjoint analysis to calculate damages in similar cases, the best-case, price-premium scenario for products like this is generally around 30% of the purchase price. Here, the Settlement Class's best day under a 30% price premium model, based on the total sales of $11.3 million (this figure includes both contaminated and noncontaminated products), would be $3.39 million dollars, and the Settlement Agreement exceeds this value.[2] Thus, the class here is recovering somewhere between approximately 100% of the price premium of what it might have recovered at trial and 31% (full disgorgement). Even on the low end, this is a significant recovery.

44. The Settlement Agreement mitigates risks and costs by providing an immediate and certain substantial monetary recovery and alleviates the risk of continued litigation.

45. The Settlement was reached after Defendants' filed their pre-motion letter outlining their grounds for a motion to dismiss Plaintiffs' claims. While Plaintiffs believed in the viability of their claims, Defendants' anticipated motion posed a significant risk that the case would be dismissed and Plaintiffs and the Settlement Class would receive nothing. The next steps in the litigation would have been resolution by the Court of Defendants' anticipated Motion to Dismiss, Plaintiffs' forthcoming motion for class certification, and Defendants' forthcoming motion for summary judgment. At minimum, these efforts would be costly and time-consuming for the Parties

---

[2] Under a price premium analysis, the recovery for the class is an even greater percentage of the damages when considering only the percentage of the Products that are believed to actually be contaminated.

11

and the Court, and create the risk that a litigation class would not be certified and/or that the Settlement Class Members would recover nothing at all.

46. Further, Defendants are represented by formidable defense counsel well-versed in class action litigation, and Defendants have indicated that they would continue to assert numerous defenses on the merits.

47. If litigation proceeds, Defendants' arguments could completely defeat, or significantly narrow, the scope of the Litigation, claims, and damages through, inter alia, successful dispositive motions or opposition to class certification.

48. In addition, if the litigation proceeded to trial, both sides would offer expert testimony on liability and damages.

49. Plaintiffs would undoubtedly face a challenge to their class-wide damages expert who would proffer a methodology for calculating aggregate class-wide economic injury. Such an expert undertaking is costly, and Plaintiff expects Defendants would challenge Plaintiffs' ability to calculate a price premium class wide.

50. Plaintiffs acknowledge the complexity in the resolution of whether advertising claims deceive reasonable consumers. A rigorous battle of the experts would include survey analyses and disputed damages analyses.

51. There is a substantial risk that a jury may accept Defendants' experts' testimony and damages arguments or award far less than the settlement amount or nothing at all.

52. While confident in their claims, Plaintiffs nonetheless faces significant risks in establishing liability.

53. If litigation continues, Plaintiffs and Class Counsel are also aware that Defendants would oppose class certification vigorously, and that Defendants would prepare a competent defense at trial. And while Plaintiffs and Class Counsel were confident in the claims alleged, it is

entirely possible that the Court could have sided with Defendants, leaving Plaintiffs and Class Members empty-handed.

54. The outcome of these proceedings cannot be certain, and if the litigation proceeds to trial, it will be a lengthy and complex affair with appeals likely to follow.

55. Consistent with Second Circuit jurisprudence, in settling the litigation, Plaintiff accounted for the estimated damages, the benefits and risks of continuing litigation against Defendants, and the range of possible outcomes should the litigation continue.

56. The settlement also will provide an immediate and certain benefit to the Settlement Class and will avoid the substantial burdens and costs that continued and uncertain litigation would impose on the parties, non-party witnesses, and the courts. Furthermore, there are many steps between here and any potential verdict.

57. Even assuming arguendo, that continued litigation might result in a larger recovery than the settlement, it would occur only after the expenditure of hundreds of thousands of dollars in costs and expenses (at best) that would eat up much of any increased recovery.

58. $11.3 million worth of the Covered Products were sold during the relevant time period. Clearly, the class consists of hundreds of thousands if not more than a million consumers who purchased the Covered Products.

59. Here, the reaction of the Class Members to the Settlement has been overwhelmingly positive. Class Notice has been provided to the Settlement Class Members in accordance with the requirements of Rule 23(c)(2)(B) and the Preliminary Approval Order. Zero Class Members objected to the Settlement, and twelve opted out.

60. Even if Plaintiffs could have defeated a motion to dismiss, obtained a class certification order and proceeded to trial, victory before the trier of fact would have been uncertain. Such uncertainty, moreover, was compounded by the appeals virtually certain to have followed any

verdict. In short, while Class Counsel believes that the claims are viable and strong, there can be no denying the array of serious class-wide risks, any one of which could have precluded the Class and its counsel from recovering anything at all.

61.     By any standard, this Settlement constitutes a favorable result made possible by the dedication and skill of Class Counsel under very difficult circumstances.

62.     Moreover, Class Counsel are qualified, experienced, and generally able to conduct the Litigation. Class Counsel have invested considerable time and resources into the prosecution of the Litigation and possess a long and proven track record of the successful prosecution of class actions, including false advertising cases, and numerous appointments as class counsel

63.     No other agreements between the Parties exist other than the Settlement Agreement.

64.     The Sultzer Law Group's firm resume is at ECF Doc. 32-2.

65.     Levin Sedran & Berman LLP's firm resume can be found at ECF Doc. 32-3.

66.     Poulin, Willey, Anastopoulo, LLC's firm resume can be found at ECF Doc. 32-4.

67.     Bradley Grombacher, LLP's firm resume can be found at ECF Doc. 32-5.

68.     Aylstock, Witkin, Kreis & Overholtz, PLLC's firm resume can be found at ECF Doc. 32-6.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of March, 2024 in Poughkeepsie, New York.

/s/ Jason Sultzer
Jason Sultzer